# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Audrey M.H.,                                    Case No. 17-cv-4975 (ECW)

        Plaintiff,

    v.                                          **ORDER**

Nancy A. Berryhill, Acting Commissioner
of Social Security,

        Defendant.

This matter is before the Court on Plaintiff Audrey M.H.'s ("Plaintiff") Motion for Summary Judgment (Dkt. No. 11) and Defendant Acting Commissioner of Social Security Nancy A. Berryhill's ("Defendant") Motion for Summary Judgment (Dkt. No. 14). Plaintiff filed this case seeking judicial review of a final decision by Defendant denying her application for disability insurance benefits. For the reasons stated below, Plaintiff's Motion is denied, and Defendant's Cross-Motion is granted.

## I.     BACKGROUND

Plaintiff filed a Title II application for disability insurance benefits on March 9, 2013, alleging disability beginning on September 21, 2007. (R. 30.)[1] Plaintiff later amended her alleged disability onset date from September 21, 2007 to March 16, 2010. (*Id.*) Plaintiff applied for benefits on November 14, 2013, alleging disability since March

---

[1]     The Social Security Administrative Record ("R.") is available at Dkt. No. 9.

16, 2010, due to Marfan syndrome, low back pain, anxiety attacks and arthritis (R. 218, 239).  Her application was denied initially and on reconsideration.  (R. 30.)  Plaintiff requested a hearing before an administrative law judge ("ALJ"), which was held on September 24, 2015 before ALJ Virginia Kuhn.  (R. 30-45.)  The ALJ issued an unfavorable decision on October 28, 2015, finding that Plaintiff was not disabled through March 31, 2014, the last date of insured.  (R. 45.)

Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a),[2] the ALJ first determined at step one that Plaintiff had not engaged in substantial gainful activity since March 31, 2014.  (R. 32.)

At step two, the ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease of the spine; and Marfan syndrome with aortic dilation, mitral valve prolapse, and joint involvement.  (R. 32.)  The ALJ determined that Plaintiff's other impairments were not severe, including her retinal detachment and aphakia.  (R. 33.)  The ALJ also concluded that the Plaintiff's alleged mental

---

[2]     The Eighth Circuit described this five-step process as follows:

The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

impairments of generalized anxiety and major depression were not medically

determinable impairments prior to the date last insured because they did not develop until

late in the relevant period and the severity quickly diminished once she began treatment.

(*Id.*)

At the third step, the ALJ determined that Plaintiff did not have an impairment that

meets or medically equals the severity of one of the listed impairments in 20 C.F.R. part

404, subpart P, appendix 1.  (R. 33-34.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had

the following residual functional capacity ("RFC"):

> [T]o perform sedentary work as defined in 20 CFR 404.1567(a)[3] and the
> Dictionary of Occupational Titles except no climbing of ladders, ropes or
> scaffolds; occasional climbing of ramps and stairs; occasional balancing,
> stooping, kneeling, and crouching; no crawling; and frequent gross and fine
> manipulation with the hands bilaterally.

(R. 34.)

At the fifth step of the sequential analysis, and based on the testimony of the

vocational expert ("VE"), the ALJ found that through the date last insured, considering

---

[3]     Section 404.1567(a) defines sedentary work was follows:

> Sedentary work. Sedentary work involves lifting no more than 10 pounds at
> a time and occasionally lifting or carrying articles like docket files, ledgers,
> and small tools. Although a sedentary job is defined as one which involves
> sitting, a certain amount of walking and standing is often necessary in
> carrying out job duties. Jobs are sedentary if walking and standing are
> required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).  Social Security Ruling 83-10 defines "occasionally" as
"occurring from very little up to one-third of the time."  SSR 83-10, 1983 WL 31251, at
*5 (S.S.A. Jan. 1, 1983).

the Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy including, bench work (DOT code 726.68S-066, sedentary, unskilled), optical accessory polisher (DOT Code 713.684-038, sedentary, unskilled), and printed circuit board assembler (DOT code 726.684-110, sedentary, unskilled). (R. 44.) Accordingly, the ALJ deemed Plaintiff not disabled. (R. 45.)

Plaintiff requested review of the decision. (R. 4.) The Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner. (R. 1-2.) Plaintiff then commenced this action for judicial review. The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties. The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.    LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law. *Nash v. Comm'r, Soc. Sec. Administration*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)). "'Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions.'" *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)). The Court "considers evidence that detracts from the

Commissioner's decision as well as evidence that supports it." *Id.* "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* (citation omitted). In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. *See Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004).

## III.  DISCUSSION

Plaintiff initially challenged three aspects of the Commissioner's decision: (1) the weight given to her treating physicians' opinions; (2) the alleged failure by the ALJ to cite or credit any specific medical evidence in support of Plaintiff's physical RFC; (3) the evaluation of her credibility by the ALJ. Plaintiff now also argues that the ALJ lacked the requisite authority to render a decision regarding her benefits pursuant to the Appointments Clause under the United States Constitution. (Dkt No. 19.) The Court will address each aspect in turn.

### A.  The Weight Assigned to the Treating Physician's Opinion

According to Plaintiff, the ALJ failed to properly consider the opinion of Plaintiff's treating geneticist, Dr. Salman Kirmani, M.B.B.S.[4] and her general practitioner Dr. Kari Bunkers, M.D., and therefore formulated an RFC that failed to incorporate all of her limitations. (Dkt. No. 12 at 11-12.) In particular, Plaintiff argues the ALJ erred by

---

[4]  Both parties agree that "M.B.B.S." refers to Bachelor of Medicine, Bachelor of Surgery, a degree awarded in countries that follow the traditions of the United Kingdom equivalent to the United States "M.D." degree.

not giving proper weight to the opinions of Drs. Kirmani and Bunkers based on the ALJ's conclusion that the opinions were not supported by clinical examinations or cardiac testing performed prior to the date last insured and that those opinions may not all relate to the period at issue. (*Id.* at 12-13.) Plaintiff maintains Dr. Kirmani specifically stated that his opinions were based on the clinical criteria set for Marfan syndrome and diagnostic testing revealing premature arthritis, and degenerative disc disease and lumbar dural ectasia, as well as an eye exam documenting bilateral lens dislocation; while Dr. Bunkers stated that her opinions were based on evidence of bilateral ectopia lentis, an MRI of the lumbar spine showing cysts, dural ectasia at multiple levels, and nerve root impingement, painful forward flexion and extension, chest tenderness, low back tenderness, and painful range of motion in the shoulders and hips. (*Id.*) Plaintiff argues that regardless of the date of the reports, Drs. Kirmani and Bunkers' opinions specifically indicated that the limitations were present prior to the last date of insured, March 31, 2014. (*Id.* at 13.)

As it relates to the opinions of Dr. Kirmani, the ALJ found as follows:

> The undersigned places little weight on these opinions because Dr. Kirmani's physical examinations and annual cardiac testing do not support the symptoms and alleged limits opined nor does the claimant's activities of daily living reported and set forth above including gardening and walking her 3.5-acre property that has a hill once or twice per day. The opinion is also inconsistent with Dr. Kirmani's and other medical providers repeated instructions that she increase her activity, more regularly perform exercises learned at physical therapy and participate in physical therapy. Additionally, the opinions are inconsistent with the prescribed course of conservative treatment that did not even include pain medication.

(R. 40.)

With respect to Dr. Bunkers' February 2014, August 2014, and April 2015 opinions regarding Plaintiff's limitations, the ALJ placed "little weight" on these opinions because: Dr. Bunkers acknowledged she treats the Plaintiff for non-severe impairments so she had no basis to make an opinion regarding the impairments she does not treat; she appeared to have based her opinion on a desire to help the Plaintiff obtain Social Security disability benefits; Dr. Bunkers' own examinations and observations in 2011, 2013 and 2014 did not support the limitations opined, including because, as noted above, she observed the claimant routinely as in no acute distress until February 2014 with normal motor, strength, sensory, and neurological examinations; the opinions were not consistent with the overall medical evidence; and Dr. Bunkers might have been commenting on Plaintiff's condition after the date last insured.  (R. 41-42.)  The ALJ gave no weight to Dr. Bunkers' August 25, 2015 Disability Impairment Questionnaire assessment for Plaintiff because it was filled out well after the last date insured and not supported by the objective medical evidence on or prior to the last date insured.  (R. 42.)

"A disability claimant has the burden to establish her RFC."  *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).  The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'"  *Id.* (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).  "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'"  *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)).

"A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it. An ALJ may elect under certain circumstances not to give a treating physician's opinion controlling weight. For a treating physician's opinion to have controlling weight, it must be supported by medically acceptable laboratory and diagnostic techniques and it must not be 'inconsistent with the other substantial evidence in [the] case record.'" *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (quoting 20 C.F.R. § 404.1527(d)(2)) (citing *Goff*, 421 F.3d at 790; *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005)). "A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions." *Id.* (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)); *see also Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) ("However, '[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'") (quoting *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)) (alteration in original) (internal quotation omitted). Moreover, "a treating physician's opinion that a claimant is 'disabled' or 'unable to work,' does not carry 'any special significance,' because it invades the province of the Commissioner to make the ultimate determination of disability." *Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009) (quoting 20 C.F.R. §§ 416.927(e)(1), (3)) (citation omitted).

### 1.    Dr. Kirmani's Opinions Relating to Plaintiff's RFC

In a March 29, 2013 "To Whom it May Concern" letter, Dr. Kirmani represented that he had taken over Plaintiff's treatment for Marfan syndrome from Dr. Virginia

Michaels who had retired. (R. 429.) Dr. Kirmani noted that Plaintiff had last seen Dr. Michaels in August 2012. (*Id.*) Dr. Kirmani referred to "significant issues" with lower back pain, with evidence of facet degeneration, dural ectasia and degenerative arthritis. (*Id.*) Dr. Kirmani based this finding on an examination by the Mayo Clinic's Spine Center. (*Id.*) According to Dr. Kirmani, Plaintiff "has filed for disability through her employer but is having trouble justifying this." (*Id.*) Based on her medical history and the record, he "fully endorsed the need for disability because she was in chronic back pain" secondary to Marfan syndrome and was unable to return to work. (*Id.*) While she had tried a number of unspecified therapies, Dr. Kirmani opined that nothing provided her with long-term relief, thereby qualifying her for disability benefits. (*Id.*) There is no evidence that Dr. Kirmani examined Plaintiff in relation to the March 29, 2013 letter. Indeed, it appears she was last seen in August 2012 for her Marfan syndrome prior to this letter. (R. 352, 429.)

On December 9, 2013, Plaintiff was seen by Dr. Kirmani for a follow-up regarding her Marfan syndrome. (R. 635.) Dr. Kirmani noted that Plaintiff claimed that she continued to struggle with "significant musculoskeletal pain and disability secondary to the diagnosis of Marfan syndrome." (*Id.*) She had been unable to work due to chronic lower back and leg pain and had unsuccessfully attempted to obtain workplace accommodations because of her diagnosis. (*Id.*) She also reported suffering from muscle cramps in her upper extremities. (*Id.*) She had not been performing any physical therapy because she could not afford the treatment. (*Id.*) As part of the visit, Plaintiff noted that she was again applying for disability and brought forms to him in this regard. (*Id.*)

9

According to Dr. Kirmani, Plaintiff's medication consisted of an antibiotic, acetaminophen, ibuprofen, blood pressure medications, and eye moisturizing drops. (*Id.*) Dr. Kirmani conducted no physical examination of Plaintiff during the follow-up. (R. 636.) Plaintiff rated her back and leg pain at 8 out of 10. (*Id.*) As to her past medical history, Dr. Kirmani noted a previous spine MRI showing degenerative disk disease and lumbar dural ectasia and arthritis. (*Id.*) Dr. Kirmani strongly recommended that Plaintiff participate in physical therapy, which she could not afford. (*Id.*) Dr. Kirmani believed that disability benefits would provide her with the money needed to pay for physical therapy. (*Id.*) Dr. Kirmani recommended continuing follow-up visits on an annual basis. (*Id.*)

On the same date, Dr. Kirmani filled out a "Summary Impairment Questionnaire" on a form provided by Plaintiff's present legal counsel. (R. 463.) Plaintiff's primary symptoms were musculoskeletal pain due to arthritis and degenerative disc disease, evidenced by an unspecified MRI and x-ray. (*Id.*) Dr. Kirmani also noted that Plaintiff had been diagnosed with mitral valve prolapse related to her heart (based on an echocardiograph) and bilateral eyes lens dislocation. (*Id.*) Plaintiff was seen for her Marfan syndrome on an annual basis and had treated with Tylenol, ibuprofen, and physical therapy for her pain. (*Id.*) According to Dr. Kirmani, Plaintiff was unable to sit, stand or walk for less than an hour in an eight-hour work day. (R. 464.) Plaintiff could frequently lift 5 pounds and occasionally lift up to 10 pounds. (*Id.*) Dr. Kirmani also opined that Plaintiff could not grasp, use her hands or fingers, and could not use her arms

for reaching.  (*Id.*)  According to by Dr. Kirmani, these limitations applied as far back as March 16, 2010.  (*Id.*)

Based on a careful review of the record, the Court concludes that the ALJ gave appropriate weight to the opinion of Plaintiff's treating physician Dr. Kirmani, as his opinions regarding Plaintiff's significant limitations are not supported by the objective medical record.  This includes a stable echocardiograph throughout the relevant period (R. 334, 335, 339, 340, 344, 348, 394, 473); a stable ophthalmology examination and good vision with corrective lenses (R. 439, 382-83, 637, 639); no significant measurable limitations to the extremities with full range of motion despite Plaintiff's arthritis related to joint hypermobility and mild finger joint enlargement (R. 331-32, 341, 344, 387, 396, 490, 493, 543, 652); conservative treatment ordered by her providers related to her pain (R. 337, 439, 454, 463, 493, 543, 633, 635); Plaintiff's report in August 2012 that she had no recurrence of "significant pain" since June 2012 (arising from using a garden hoe while working in her garden) (R. 382); and that pain or pressure while sitting and standing was alleviated when she shifted her position and only lasts 30-60 minutes once every three months (R. 398, 650).

Dr. Kirmani's severe limitations are also not consistent with other contemporaneous examinations of Plaintiff by other medical providers.  Of particular interest is the September 11, 2013 opinion of Dr. Dhamija Radhika, M.B.B.S.  This opinion was given "great weight" by the ALJ.  (R. 40.)  Dr. Radhika, under the supervision Dr. Kirmani, assessed Plaintiff as part of her annual follow-up related to her Marfan syndrome.  (R. 351.)  This was the follow-up just prior to Dr. Kirmani's

11

December 2013 consult with Plaintiff and makes no mention by Plaintiff about seeking

disability benefits.  Dr. Radhika noted that Plaintiff reported similar musculoskeletal and

arthritis complaints as she had the previous year.  (R. 352.)  As part of the physical

examination of Plaintiff, Dr. Radhika noted that Plaintiff was not in acute distress.  (R.

354.)  Dr. Radhika was encouraged by an echocardiogram that had remained stable for

several years and Plaintiff's stable ophthalmology examination.  (*Id.*)  As it related to

Plaintiff's musculoskeletal pain, Dr. Radhika provided:

> We again discussed management issues for her musculoskeletal pain
> including being physically active but doing the right kind of exercise.  She
> is not currently doing any physical therapy at a center but does understand
> the importance of starting it again.

(R. 355.)  Indeed, during her September 25, 2013 general wellness examination at the

Mayo Clinic, Plaintiff represented that she had "**chronic back pain managed** by

physical therapy" and that "patient reports no current or active concerns at this time.  **She**

**states overall she feels well.**"  (R. 454 (emphasis added).)

The only MRI imaging available in the record to Dr. Kirmani for Plaintiff's

limitations occurred in October 2011.  (R. 382, 413, 670.)  Plaintiff was also evaluated by

x-ray in September 2011.  (R. 671.)  Plaintiff's x-ray results do not support the severe

limitations imposed by Dr. Kirmani.  The result of the x-ray was "slight" loss of the

normal lumbar lordosis,[5] "mild" disk space narrowing and "mild" facet arthritis of the

---

[5]     Lordosis: "the normal anteriorly convex curvature of the lumbar segment of the
vertebral column. . . ."  STEADMAN'S MEDICAL DICTIONARY, 1119 (28th ed. 2006).

lower lumbar spine, for all of which "conservative treatment with physical therapy was recommended." (R. 337, 671.)

Similarly, the MRI and consult with the Mayo Clinic Spine Center do not support Dr. Kirmani's severe limitations for Plaintiff. The imaging arose out of Plaintiff's consult in October 2011 with the Mayo Clinic Spine Center. (R. 650.) During the consult, Plaintiff claimed to have been living with back pain for 15-20 years with the pain worsening "somewhat" that year in the middle of her lower back with no radiation into her legs. (*Id.*) She noted that if she had pain while sitting, a shift of position helped. (*Id.*) The examination of Plaintiff showed that she was not in any acute distress; her spine showed a pain-free motion; palpitation of the spine only showed "some" tenderness in the lower lumbar region; FABER,[6] Gaenslen,[7] and Stinchfield's[8] tests did not reproduce her pain; lower lumbar quadrant loading[9] did reproduce pain; Plaintiff showed

---

[6]  The Flexion Abduction External Rotation (FABER) test is commonly utilized as a provocation test to detect hip, lumbar spine, or sacroiliac joint pathology. *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5159634/.

[7]  Gaenslen sign involves "pain in the hyperextension of the hip with pelvis fixed by flexion opposite hip' causes a torsion stress at the sacroiliac and lumbosacral joints." STEADMAN'S MEDICAL DICTIONARY, 1769 (28th ed. 2006).

[8]  Stinchfield's test measures the strength and flexibility of the hip extensors and the integrity of their tendons. *See* The University of West Alabama Athletic Training & Sport Medicine Center, Stinchfield Test http://at.uwa.edu/Special%20Tests/SpecialTests/ LowerBody/stinchfield.htm (citing Hoppenfeld Physical Examination of the Spine & Extremities, Athletic Injury Assessment (4th Ed.)).

[9]  Lumbosacral facet loading during a physical exam has been used to diagnose facetogenic pain. This maneuver is performed by having the patient extend and rotate the spine. This serves to increase pressure on the facet joints thus eliciting a pain response. *See* https://www.ncbi.nlm.nih.gov/books/NBK441906/.

normal balance and gait; she demonstrated normal strength and reflexes in her extremities; and her leg raises did not reproduce any pain. (R. 652.) The Spine Center recommended physical therapy and that Plaintiff take Tylenol and ibuprofen for her pain. (*Id.*) The Spine Center also ordered the previously mentioned MRI. As it relates to the MRI results, Plaintiff's treating physician for Marfan syndrome previous to Dr. Kirmani, Dr. Michels, stated in August 2012 that Plaintiff:

> [W]as known by MRI to have some dural ectasias and neurenteric cyst, but there was no significant impingement of the spinal cord itself nor on the spinal nerves. Rather most of her pain was interpreted as musculoskeletal. She also had some mild facet arthritic degeneration compatible with age."

(R. 382.) Dr. Kirmani, who does not appear to have examined Plaintiff during the period of disability onset (March 2010) through the last date of insured, noted in his March 2013 opinion that Plaintiff had been last examined in August of 2012 by Dr. Michels (R. 429). While Dr. Kirmani's limitations relied on the imaging results, Dr. Michels' findings regarding the imaging (as set forth above and below) do not support Dr. Kirmani's claimed pain and limitations for Plaintiff:

> Mrs. [H] is a very pleasant woman whose Marfan syndrome has been remarkably stable. She has some degenerative arthritic changes, which are incidental to her primary diagnosis. Although she has some dural ectasis and neurenteric cysts, these are not contributing significantly to her musculoskeletal back pain at this time. As per the Spine Center, the recommendation remains that she should seek updated evaluation if there is significant change in back pain or pain that radiates to her lower extremities.
>
> * * *
>
> She is reminded of the importance of keeping her weight under control. She should not definitely gain any weight. It is recommended that she do exercise as prescribed on a more regular basis.

(R. 384.)

Accordingly, this Court concludes that the ALJ's assessment of Dr. Kirmani's opinions and the respective weight assigned to those opinions is supported by substantial evidence, especially since his opinions are inconsistent with the record as a whole and his own conservative treatment regimen for Plaintiff is inconsistent with the functional limitations assessed. *See Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016) (physician's opinion undermined by claimant's conservative, routine course of treatment); *Stormo v. Barnhart*, 377 F.3d 801, 805-06 (8th Cir. 2004) (finding that the opinions of treating physicians "are given less weight if they are inconsistent with the record as a whole or if the conclusions consist of vague, conclusory statements unsupported by medically acceptable data"); *see also Rogers v. Berryhill*, 702 F. App'x 502, 503 (8th Cir. 2017) (taking into account the fact that the treating physicians "prescribed only conservative treatment" in the decision to discount the RFC opinion of a treating physician).

## 2. Dr. Bunkers' Opinions Relating to Plaintiff's RFC

On February 21, 2014, Dr. Bunkers issued a "to whom it may concern" letter regarding Plaintiff. (R. 508.) The letter noted that Plaintiff was applying for social security benefits. (*Id.*) According to Dr. Bunkers, Plaintiff could not work due to fatigue related to her cardiovascular and musculoskeletal health; severe pain in multiple joints due to arthritis, muscle cramps, severe back pain; problems with Plaintiff's eyes; and chest pain. (R. 508-09.) Dr. Bunkers offered no support for these ailments or how they limited Plaintiff. Dr. Bunkers opined that Plaintiff clearly qualified for social security disability benefits. (R. 509.)

On August 12, 2014, Dr. Bunkers issued another "to whom it may concern" letter providing that Plaintiff suffered from chronic pain, aortic dilation, retinal detachment, and cardiac symptoms related to Marfan syndrome. (R. 585.) Dr. Bunkers acknowledged that she primarily treated Plaintiff for her psychological and women's health issues. (*Id.*) According to Dr. Bunkers, Plaintiff had an escalation of chronic pain affecting her hips, knees, neck, back, and hands. (R. 589.) While Plaintiff had done physical therapy in the past, Dr. Bunkers noted Plaintiff could not afford to continue with the therapy. (*Id.*) Dr. Bunkers asserted Plaintiff needed social security benefits in order to pay her medical bills and obtain physical therapy. (*Id.*) She also issued a similar letter on April 20, 2015 and filled out a disability impairment questionnaire on August 25, 2015, going so far as to opine without any support that Plaintiff was unable to sit for one hour in an eight-hour work day and stand for one-hour in an eight-hour work day and had significant limitations using her hands. (R. 608, 623-24.) According to Dr. Bunkers, these limitations had persisted since March 16, 2010 and she was unable to maintain any regular employment. (*Id.*)

The Court concludes that the ALJ gave appropriate weight to the opinions of Dr. Bunkers. Any assertion by Dr. Bunkers that Plaintiff is unable to work is entitled to no special weight. *See Davidson*, 578 F.3d at 842 (citation omitted). In addition, Dr. Bunkers' opinions regarding Plaintiff's limitations caused by severe pain in her hands, her hips, knees, neck, back and hands, heart problems, and vision problems are contradicted by her own treating notes during the relevant time period. *See Anderson*, 696 F.3d at 793 (finding that an ALJ may discount or even disregard the opinion of a

16

treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions) (citation omitted).  On December 13, 2011, Plaintiff saw Dr. Bunkers for a preventative examination.  (R. 496.)  Plaintiff's only concern was back pain but noted that her evaluation at the Mayo Clinic showed no operable problems and that she had some relief with physical therapy for her muscular pain and that she would continue with that therapy.  (*Id.*)  Plaintiff's examination by Dr. Bunkers showed that Plaintiff did not appear in acute distress, her eyes were normal, she had a normal heart rate with murmurs, her spine was straight and nontender, her extremities were normal as was her motor and sensory examination.  (R. 497.)  Dr. Bunkers' impression of Plaintiff included lower back pain that was improved with physical therapy and exercise was recommended.  (*Id.*)  No other mention of pain was found in the report.

Plaintiff again saw Dr. Bunkers in January 2013 for a preventative examination. (R. 492.)  According to Dr. Bunkers, Plaintiff had "**chronic low back pain managed by exercise**."  (*Id.* (emphasis added).)  The systems' review for Plaintiff's eyes, cardiovascular, musculoskeletal, psychological, and neurological systems were all negative.  (*Id.*)  Similar to her December 2011 visit, Plaintiff's examination by Dr. Bunkers showed that Plaintiff did not appear in acute distress, her eyes were normal, she had a normal heart rate with murmurs, her spine was straight and nontender, and her extremities were normal as was her motor and sensory examination.  (R. 493.)

Plaintiff next saw Dr. Bunkers in February 2014.  (R. 486.)  One of the chief complaints was "[c]hronic pain from Marfan's pursuing SSDI."  (*Id.*)  The review of Plaintiff's eyes and cardiovascular systems was negative.  (*Id.*)  Plaintiff reported "[m]usculoskeletal significant for back pain and limb pain" and that the "pain and disability [was] insufficiently managed by exercise."  (*Id.*)  Despite these reports of significant pain, Plaintiff's examination by Dr. Bunkers showed that Plaintiff did not appear in acute distress, her spine was straight and nontender, her extremities were normal as were motor and sensory examinations.  (R. 487.)  It appears that no other testing was performed by Dr. Bunkers related to Plaintiff's subjective complaints of back and limb pain and the only plan for Plaintiff was to increase her exercise given her high BMI.  *See Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017) ("[A]n ALJ need not give a treating physician's opinions controlling weight when the opinion is based on a claimant's subjective complaints that [the] ALJ does not find credible.").  In sum, Dr. Bunkers' treatment notes simply do not support her claims of disability.  While there is no dispute that Plaintiff suffers from Marfan syndrome and back pain, Dr. Bunkers' treatment notes for Plaintiff are inconsistent with her claims that Plaintiff lacked the characteristics necessary to sustain employment, and demonstrate that her opinions were not entitled to significant weight.  *See Anderson*, 696 F.3d at 793.

In addition, as set forth above with regard to the opinions of Dr. Kirmani, Dr. Bunkers' extreme limitations for Plaintiff are contrary to the medical evidence in the record as a whole.  Therefore, for all of the reasons stated above, the Court concludes that

the decision by the ALJ to provide the opinions of Dr. Bunkers with little to no weight is supported by substantial evidence in the record as a whole.

### 3. Whether the ALJ Considered the Factors under 20 C.F.R. §§ 404.1527 and 416.927 in Assessing the Weight Given to the Treating Providers.

Plaintiff also argues the ALJ failed to consider all of the factors under 20 C.F.R. §§ 404.1527 and 416.927 in rejecting the opinions provided by Drs. Kirmani and Bunkers. (Dkt. No. 12 at 15.) If an ALJ determines not to grant controlling weight to a treating physician's opinion, such opinions must be further evaluated under the factors described in 20 CFR §§ 404.1527 and 416.927. *See* SSR 96-2p, 1996 WL 374188, at *4 (S.S.A. July 2, 1996). Under 20 C.F.R. §§ 404.1527(c), 416.927(c), medical opinions from treating sources are weighed using several factors: (1) the examining relationship; (2) the treatment relationship, such as the (i) length of the treatment relationship and frequency of examination and the (ii) nature and extent of the treatment relationship; (3) supportability of the opinion; (4) consistency of the opinion; (5) specialization; and (6) other factors. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

At the beginning of the ALJ's analysis, the ALJ stated that the opinion evidence was analyzed "in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p," thus acknowledging the appropriate considerations. (R. 34.) "[T]he regulations do not strictly require the ALJ to explicitly discuss each factor under 20 C.F.R. § 404.1527(c)." *Mapson v. Colvin*, No. 14-cv-1257 (SRN/BRT), 2015 WL 5313498, at *4 (D. Minn. Sept. 11, 2015) (internal brackets and marks omitted) (citing *Roesler v. Colvin*, No. 12-cv-1982 (JRT/JJK), 2013 WL 4519388, at *5, n.5 (D. Minn.

19

Aug. 26, 2013)).  Rather, when assigning weight to a medical opinion, the ALJ should explain her decision regarding the weight given to a medical opinion to "allow[ ] a claimant or subsequent reviewer to follow the adjudicator's reasoning."  20 C.F.R. § 404.1527(f)(2).  The Court finds that the ALJ adequately provided her basis for the little to no weight assessed to the opinions of Drs. Kirmani and Bunkers and adequately addressed the factors under 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The ALJ addressed the providers' extent of treatment of Plaintiff and their specialties in relation to their opinions.  (R. 39-42.)  The ALJ also addressed the inconsistency in the opinion and supportability of the record in relation to their own treatment notes and the record as a whole.  (*Id.*)  As such, the Court rejects Plaintiff's assertion that the ALJ failed to consider the factors under 20 C.F.R. §§ 404.1527 and 416.927.

## B.     Medical Evidence in Support of Plaintiff's Assigned Physical RFC

Relying on SSR 96-8p, Plaintiff argues that the ALJ failed to cite or credit any specific medical evidence in support of her physical RFC finding for Plaintiff.  (Dkt. No. 12 at 17.)  SSR 96-8p is the Social Security Ruling that sets forth the Social Security Administration's policies and policy interpretations regarding the assessment of residual functional capacity.  In the section entitled "Narrative Discussion Requirements," it states in relevant part that a residual functional capacity "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR 96–8p, 1996 WL 374184, at*7 (S.S.A. July 2, 1996).  There is no requirement that an ALJ follow each RFC limitation with a list of specific, supporting evidence.  *See Wilfong*

*v. Berryhill*, No. 4:17-CV-2747-SNLJ, 2018 WL 4489453, at *4 (E.D. Mo. Sept. 19, 2018); *Zorsch v. Berryhill*, 2018 WL 3493087 at *3 (W.D. Mo. Jul. 20, 2018); *Kimmel v. Berryhill*, 2017 WL 1105122 at *5 (E.D. Mo. Mar. 24, 2017). "Moreover, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (citation omitted) (highly unlikely that ALJ did not consider and reject physician's opinion when ALJ made specific references to other findings set forth in physician's notes). In addition, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526–27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)). Rather, the RFC should be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Id.* (quoting *Myers*, 721 F.3d at 527).

Here, the ALJ provided the required narrative by summarizing Plaintiff's treatment notes, the objective medical evidence of record, opinion evidence, Plaintiff's self-reported activities, and various credibility factors in assessing Plaintiff's RFC. Since the narrative plainly explains each conclusion by referencing evidence in the record, including an extensive discussion of the available medical evidence (R. 35-43), the RFC statement satisfies the requirements imposed by SSR 96-8p.

**C.    The ALJ's Assessment of Plaintiff's Credibility**

An ALJ is "in a better position to evaluate credibility" than this Court, and thus deference is given to the ALJ's decision when it is supported by substantial evidence.

21

*Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)).  When evaluating subjective complaints, an ALJ must consider:

> 1. the claimant's daily activities;
>
> 2. the duration, frequency and intensity of the pain;
>
> 3. precipitating and aggravating factors;
>
> 4. dosage, effectiveness and side effects of medication; [and]
>
> 5. functional restrictions.

*Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); *see also Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016); SSR 96-7p, 1996 WL 374186 (S.S.A. July 2, 1996).[10]  Although an ALJ must consider each factor above, she need not expressly discuss each one.  *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008).  The ALJ may discount subjective complaints "if there are inconsistencies in the evidence as a whole."  *Polaski*, 739 F.2d at 1322.  "Credibility determinations are the province of the ALJ, and as long as good reasons and substantial evidence support the ALJ's evaluation of credibility, [courts] will defer to [the ALJ's] decision."  *Julin*, 826 F.3d at 1086 (citation and marks omitted).

---

[10]  SSR 96-7p was superseded by Social Security Ruling 16-3p Titles II and XVI: Evaluations of Symptoms in Disability Claims, 2017 WL 5180304 (S.S.A. Oct. 25, 2017), which applies to "determinations and decisions on or after March 28, 2016."  *Id.* at *1.  Because the ALJ's decision was rendered on October 28, 2015, SSR 96-7 and the *Polaski* factors are the appropriate standard by which to analyze ALJ's determination.

Plaintiff criticizes the ALJ's credibility determination on several grounds. First, she asserts that the ALJ incorrectly found there was insufficient clinical and objective support for Plaintiff's allegations of pain. (Dkt. No. 12 at 19.) While there is no dispute that the medical record supports Plaintiff's claim that she suffered from back pain and some arthritic pain, there is no record of debilitating pain precluding her from working until she began overtly communicating to her providers that she was seeking disability benefits. As set forth more fully above in Section III.A. of this Order, the objective medical evidence in this record supports the ALJ's finding relating to Plaintiff's complaints of pain. As late as September 2013, Plaintiff's treatment for her back pain involved only being physically active and she represented to another provider in the same month that she had "chronic back pain **managed** by physical therapy" and that "patient reports no current or active concerns at this time. **She states overall she feels well.**" (R. 454, 492 (emphases added).) Again, it was only when Plaintiff told her providers that she was seeking disability benefits that providers asserted that she was unable to work due to various types of pain. (*See*, *e.g.*, R. 486, 635.) However, even Dr. Bunkers (who staunchly claimed Plaintiff was disabled) noted in her examinations of Plaintiff during the period of insurance that Plaintiff did not appear in acute distress, that her spine was straight and nontender, her extremities were normal as were motor and sensory examinations. (R. 487, 493, 496-97.) In sum, the ALJ's finding that Plaintiff's level of

subjective complaints of pain are not supported by the objective medical evidence is supported by substantial evidence.[11]

Plaintiff also argues her minimal activities of daily living are not inconsistent with a finding that she is disabled. With regard to her activities of daily living the ALJ concluded as follows:

> The claimant's active daily routine was inconsistent with her subjective complaints, but consistent with the residual functional capacity set forth. She was independent in self-care and grooming, and performed routine household chores such as cooking, cleaning, dishwashing, laundry, pet care, shopping, and bill paying. In addition, she did puzzles, drove, gardened, read books, visited with family and friends, walked for 20-25 minutes per day when the weather was nice, and watched television. In late August 2010, she reported she was busy gathering vegetables from her garden and that she occasionally walked around her 3.5-acre lot that had a hill.

(R. 38.)

The substantial evidence in the record regarding Plaintiff's daily activities also weighs against her credibility. *See Haley v. Massanari*, 258 F.3d 742, 748 (8th Cir. 2001). During her 2010 examination with Dr. Michels, Plaintiff represented that she got regular exercise by gardening and walking her 3.5-acre lot, including a hill, once or twice a day. (R. 663.) In September 2011, Plaintiff told Dr. Michels she walked 20-25 minutes a day. (R. 659.) In May 2013, Plaintiff represented she could handle her own personal

---

[11] Plaintiff asserts that a credibility determination or decision cannot be made solely based on the objective medical evidence because symptoms cannot be measured objectively through clinical or laboratory diagnostic techniques. (Dkt. No. 12 at 17-18.) However, this is a non-issue in the present case because the ALJ considered the relevant *Polaski* factors in her decision (R. 35, 37-38), as further evidenced by Plaintiff's argument that "ALJ also erred by finding Ms. [H's] allegations inconsistent with her course of treatment, her response to medications, and her daily activities." (Dkt. No. 12 at 18.)

care, could prepare meals, and do laundry and housework if she took frequent breaks. (R. 249-50.) Plaintiff asserted that she walked daily (at least a block before needing rest) and could drive. (R. 251-52.) She grocery shopped and could manage her finances. (R. 251-52.) Her hobbies included puzzles and she cared for her pets, including bathing them. (R. 249, 252.) Plaintiff provided similar representations regarding the extent of her activities in May 2014. (R. 272-79.) A claimant's ability to engage in such daily activities weighs against a finding of complete disability. *See Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1090 (8th Cir. 2018) ("Nash testified she performs personal tasks, housework, and errands. She visits friends several times a week. These "regular physical activities . . . undermine her assertion that she is unable to perform even sedentary work." (quoting *Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015)); *see also Ponder v. Colvin*, 770 F.3d 1190, 1195-96 (8th Cir. 2014) (finding that activities such as "cook[ing] . . . , handl[ing] money and pay[ing] bills, shop[ping] for groceries and clothing, watch[ing] television, driv[ing] a vehicle, leav[ing] her house alone, [and] regularly attend[ing] church" are not consistent with allegations of total disability); *Larry W. v. Berryhill*, No. 17-CV-00988 KMM, 2018 WL 4654713, at *7 (D. Minn. Sept. 27, 2018) (finding that activities, including taking care of a cat, inconsistent with the claimant's complaints of disabling pain).

The Court also disagrees with Plaintiff's argument that the ALJ erred by finding her course of treatment inconsistent with a finding of disability. Plaintiff's treatment for her pain has been very conservative, only treating with Tylenol, ibuprofen, and physical therapy. According to Plaintiff, her pain had been managed by physical therapy, but she

had discontinued such treatment.  (R. 355, 454, 635.)  Such conservative treatment is

inconsistent with Plaintiff's claims of disabling pain.  *Black v. Apfel*, 143 F.3d 383, 386

(8th Cir. 1998) ("The ALJ also noted that although Black does experience some

limitation, pain, and discomfort, she has never undergone surgery and has relied on a

conservative course of treatment, including exercises, home cervical traction, a back

brace, and medication.") (citing *Robinson v. Sullivan*, 956 F.2d 836, 840 (8th Cir. 1992)).

Plaintiff claims that she could not afford physical therapy.  However, she testified before

the ALJ that she was covered by her husband's medical insurance, which at least covered

some of the physical therapy, and her husband is employed earning $2,700 a month and

they have savings.[12]  (R. 65-66, 648.).

Finally, Plaintiff noted she had a work history with sustained earnings every year

for nearly 25 years prior to the onset of her disability and that her work history is not

consistent with an individual who is exaggerating or has no desire to work.  (Dkt. No. 12

at 20.)  The ALJ acknowledged Plaintiff's long work history and desire to continue

employment with her former employer.  (R. 38.)  However, the ALJ found that Plaintiff

did not look for any other work after she stopped working and began receiving short-term

disability benefits from her former employer.[13]  (*Id.*)  Further, as the ALJ noted,

Plaintiff's inability to perform her past relevant work does not mean she is disabled under

---

[12]     The Court notes that Plaintiff does not assert that she lacked access to free or low-cost medical services.  *See* SSR 96-7P, 1996 WL 374186, at *8 (S.S.A. July 2, 1996).

[13]     Plaintiff had to leave her job because her employer would not accommodate her restrictions (R. 635), and there was no indication that she attempted to find employment that could accommodate her restrictions.

Social Security Regulations, and her work history alone does not bolster the credibility of her allegations in the absence of supporting medical evidence, her daily activities of living, and conservative treatment for pain. (*Id.*) As set forth above, the ALJ considered Plaintiff's work history. However, Plaintiff acknowledged in the record that her previous job involved lifting up to 50 pounds, that she "stood to do jobs", she performed "very little sit down jobs" and "did a lot of running." (R. 303.)

While Plaintiff may have had legitimate reasons to stop working at her past job due to pain given the tasks she was required to perform in that position, the exertion level of her past position is not the same as the sedentary RFC assigned by the ALJ and substantial evidence supports the ALJ's decision to discount her credibility. Because the Court may not reweigh the evidence, the ALJ's determination is not erroneous. *See Julin*, 826 F.3d at 1086.

## D. Appointments Clause Challenge

In a supplemental letter to the Court, Plaintiff argues for the first time that remand is appropriate in this case because the ALJ who decided her claim was an inferior officer "not constitutionally appointed at the time of the decision in this case." (Dkt. No. 19.) In support of this argument, Plaintiff relies on the decision by the United States Supreme Court in *Lucia v. SEC*, 138 S. Ct. 2044 (2018). In *Lucia,* the Supreme Court held that executive agency ALJs are "officers of the United States" and are therefore governed the to the Appointments Clause of the United States Constitution, Article II, section 2, clause 2. *See Lucia*, 138 S. Ct. at 2055. The Appointments Clause provides that the President:

Shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the [S]upreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law **vest the Appointment of such inferior Officers, as they think proper, in the President alone**, in the Courts of Law, or in the Heads of Departments.

U.S. Constitution, Art. II, § 2, cl. 2 (emphasis added).

In *Lucia*, the plaintiff timely contested the validity of the ALJ's appointment by raising the challenge before the Securities and Exchange Commission, as well as in the Court of Appeals and the Supreme Court. 138 S. Ct. at 2055 (finding that the plaintiff "made just such a timely challenge: He contested the validity of [the ALJ's] appointment before the Commission, and continued pressing that claim in the Court of Appeals and this Court."). The Eighth Circuit has determined that a constitutional challenge under the Appointments Clause is non-jurisdictional, and, therefore, a party may forfeit her Appointments Clause claim by failing to raise it at the administrative level. *See N.L.R.B. v. RELCO Locomotives, Inc.*, 734 F.3d 764, 798 (8th Cir. 2013) (holding that a party waived the Appointments Clause challenge by failing to raise the issue before the agency).

Plaintiff cites to *Sims v. Apfel*, 530 U.S. 103, 112 (2000) for the proposition that her failure to raise the Appointments Clause challenge at the administrative level is not fatal to her argument because there is no issue exhaustion requirement in Social Security appeals. *Id.* at 112 ("Claimants who exhaust administrative remedies need not also exhaust issues in a request for review by the Appeals Council in order to preserve judicial review of those issues."). It is important to note that the Supreme Court in *Sims* did not

reach the issue of whether a claimant needed to raise an issue sometime during the administrative review, noting that "[w]hether a claimant must exhaust issues before the ALJ is not before us." *Id.* at 107. While Plaintiff may not have to raise the Appointments Clause challenge to the Commissioner via the Appeals Council, *Lucia* made it clear that, with regard to Appointments Clause challenges, only "one who makes a timely challenge" to the administrative body is entitled to relief. *Lucia*, 138 S. Ct. at 2055 (citation omitted); *see also Stearns v. Berryhill*, No. C17-2031-LTS, 2018 WL 4380984, at *5 (N.D. Iowa Sept. 14, 2018). The Eighth Circuit has concluded that a Social Security disability claimant's failure to raise a disability claim to an ALJ "waived [the claim] from being raised on appeal." *Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir. 2003) ("Anderson never alleged any limitation in function as a result of his obesity in his application for benefits or during the hearing. Accordingly, this claim was waived from being raised on appeal."). As such, given that Plaintiff failed to raise the Appointments Clause challenge at any point during the administrative process, she has waived this claim.

## IV.  ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1.  Plaintiff Audrey M.H.'s Motion for Summary Judgment (Dkt. No. 11) is **DENIED**;

2.  Defendant Acting Commissioner of Social Security Nancy A. Berryhill's Motion for Summary Judgment (Dkt. No. 14) is **GRANTED**; and

3.    This case is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: February 14, 2019                *s/ Elizabeth Cowan Wright*
                                     ELIZABETH COWAN WRIGHT
                                     United States Magistrate Judge